UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL RUEDE,

     Plaintiff,

v.

CERTAINTEED CORPORATION,

     Defendant.

Case No. 19-12943
Honorable Laurie J. Michelson

---

## OPINION AND ORDER
## GRANTING MOTION FOR SUMMARY JUDGMENT [18]

Paul Ruede, Ph.D., worked for CertainTeed Corporation for many years. In 2016 and 2017, two new people became his direct supervisor and his direct supervisor's supervisor. At that time, Ruede was in his sixties and the two new supervisors were in their forties. Ruede's two-above supervisor rated Ruede's 2016 performance negatively, and Ruede's direct supervisor rated Ruede's 2017 performance negatively. Ruede was eventually placed on a performance improvement plan. Although Ruede completed the plan's listed objectives, he continued to have performance issues, and CertainTeed fired him less than three months later. In Ruede's view, those circumstances are suspicious, and he believes that his age motivated CertainTeed's termination decision.

So Ruede filed this lawsuit, alleging that CertainTeed violated state and federal laws prohibiting age discrimination in the workplace. After the parties completed discovery, CertainTeed sought summary judgment. Having thoroughly reviewed the summary-judgment record, the Court concludes that no reasonable jury could find that Ruede's age played any legally significant role in CertainTeed's decision to fire Ruede. Thus, for the reasons set out below, the Court will GRANT CertainTeed's motion for summary judgment.

I.

A.

Because CertainTeed seeks summary judgment, the following factual summary is based on reading the record in the light most favorable to Ruede. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Ruede was born in 1951. In 1982, he earned a doctorate in organic chemistry. (ECF No. 21, PageID.899.) Since that time, he has worked for a few companies, including Owens Corning. (ECF No. 21, PageID.900.) Ruede's work has included evaluating asphalt coatings and developing adhesives for solar panels. (*See* ECF No. 21, PageID.899–900.)

CertainTeed is a "leading brand of . . . building products, including roofing, siding, fenc[ing], [and] decking." About CertainTeed, CertainTeed, https://perma.cc/Q55B-JQ26. "CertainTeed and its affiliates have more than 6,300 employees and more than 60 manufacturing facilities throughout the United States and Canada." *Id.* The events leading to this case all occurred at CertainTeed's Development Center in Jackson, Michigan.

Ruede started with CertainTeed in 1999. (PageID.260.)[1] In 2004, CertainTeed decided to reduce operations in Jackson, Michigan where Ruede was working. (PageID.262.) Although the company initially planned to transfer Ruede to Pennsylvania, CertainTeed later decided that his analytical skills were not needed there, and so he was let go. (PageID.262.)

But about six years later, CertainTeed rehired Ruede. (PageID.280.) In particular, Ruede was hired as a "Senior Materials Scientist" at the Development Center in Jackson, Michigan. (PageID.869.) Ruede and George Walrath were the only two chemists who worked at the Development Center. (PagID.288.) At the time of his rehire in December 2010, Ruede was 58 years old (*see* PageID.159), and Walrath was about 62 years old (*see* PageID.395–396; PageID.739).

---

[1] All record citations are to ECF No. 18, unless otherwise indicated.

3

By the summer of 2016, Ruede was over five years into his second stint at CertainTeed. At this time, he was spending a significant amount of his working hours on CertainTeed's "ICON" project. (PageID.298, 302, 496, 612.) To simplify, ICON was a type of siding for houses. (PageID.466.) At the Development Center, Ruede was the only chemist that worked on ICON. (PageID.392.) ICON eventually reached the market, but its run was short-lived. There were complaints from builders and homeowners about gaps forming between the planks. (PageID.480.) And the product was also not cost-effective for CertainTeed to produce. (PageID.600.)

In August 2016, CertainTeed hired Dev Barpanda, Ph.D. (PageID.460, 501.) Prior to joining CertainTeed, Barpanda held a senior research and development position at Dow Chemical; in that role, he supervised other doctoral-level scientists or engineers. (PageID.464–469.) When Barpanda was hired at CertainTeed, he became the supervisor of Ruede's direct supervisor. (*See* PageID.485.) At the time of his hire, Barpanda was 46 years old, and Ruede was 65 years old. (*see* PageID.159, 492.)

Ruede believes that Barpanda treated him harshly or unfairly. Ruede recalls that in late 2016, he was going to be late for a meeting and informed the presenter that he would be late. (PageID.211–212.) When Ruede arrived

4

at the meeting, Barpanda "turned to [Ruede] and said, 'You know, you could be courteous and tell people when you're going to be late.'" (PageID.211.) After both Ruede and the presenter told Barpanda that Ruede had in fact given notice, "Barpanda . . . [sat there] cross-armed, fuming, furious, staring straight ahead." (PageID.212.) As another example, in early 2017, Barpanda forced Ruede to clean up a mess in the lab left by two interns. (PageID.216–217.) Not only was this not Ruede's responsibility (Ruede had already cleaned up his part of the lab), it caused Ruede to miss a deadline for his direct supervisor. (*Id.*) Ruede also recalls other incidents with Barpanda, including that Barpanda forced him (but not younger workers) to do calculations by hand (PageID.213, 230, 234) and that Barpanda would force him and the other older chemist, Walrath, to complete work in less time than younger workers (PageID.391–392).

In January 2017, CertainTeed hired Jay Tudor. (PageID.295, 484.) Tudor had worked for Dow Chemical for 21 years and reported to Barpanda for some of that time. (PageID.501, 596.) Tudor, who did not hold a doctorate (PageID.594), became Ruede's direct supervisor at CertainTeed (PageID.485). At the time of his hire, Tudor was about 43 years old. (*See* PageID.607.)

5

In March 2017, Ruede was issued his performance review for the 2016 calendar year. (PageID.570–579.) Because Tudor had only recently taken over as Ruede's direct supervisor, Barpanda completed Ruede's performance review. (PageID.312.) Barpanda's review was based on discussions with Ruede's former direct supervisor (the one before Tudor) as well as his own personal observations of Ruede. (PageID.473–474.) Barpanda's review of Ruede was not positive. He wrote, "Going forward— Paul needs better project planning and prioritization skills to be successful and should move away from the need to be guided for short-term (weekly) in a task-list fashion (which is NOT expected at his senior-level Material Scientist role), he needs to demonstrate that he shares information willing[ly] with other team members." (PageID.579.) Barpanda thought that Ruede needed to demonstrate better "[p]rofessionalism, planning/organization, communication, project leadership/ownership, responsiveness as well deeper-science understanding." (*Id.*) Barpanda added, "[l]ack of sustained improvement next 1–2 months on all areas (mentioned above) can lead to more formal establishment of improvement plan." (*Id.*)

In addition to Barpanda's opinion, Ruede's performance review for 2016 also included feedback from other CertainTeed employees. One wrote,

"Paul commonly starts but does not finish well on projects." (PageID.579.) Another thought, "[Paul] often does not prioritize his work well enough to bring his project steps to a conclusion." (*Id.*) Although Ruede has not attempted to disprove these statements, he does claim that they were "cherry-picked." (PageID.319.) According to Ruede, Barpanda only included his coworkers' negative comments in his performance review and omitted their positive remarks. (PageID.319.)

In July 2017, Tudor (i.e., Ruede's direct supervisor) hired Nikhil Japtiwale as a materials test engineer. (PageID.664, 666–667.) Although his precise age is not disclosed in the record, Ruede has described Japtiwale as a "younger" worker. (PageID.392; *see also* PageID.393 (indicating Japtiwale had only five years' experience).) Ruede was involved in the hiring process and thought that Japtiwale did not have adequate experience for the position. (PageID.393, 872.)

Soon after Japtiwale's hire, either Barpanda or Tudor assigned two college interns to work under Japtiwale. (PageID.366, 368.) In Ruede's view, the interns were assigned to a new hire as opposed to him or Walrath (the other senior chemist) because "[Japtiwale] wanted to be a manager and this is how to become a manager." (PageID.368.) Ruede would later explain that CertainTeed "[had an] initiative to hire younger people and have them be

7

promoted to managers in the system rather than having people from the outside coming in." (PageID.369, 378.)

In October 2017, Tudor issued Ruede a 90-day performance improvement plan (PIP). (PageID.690–692.) Among the listed "Performance Concerns" was that a catalyst for the ICON siding material had become obsolete in 2016, but Ruede had not completed the specifications or obtained approval for an alternate catalyst; that finding an alternate source for "fly ash" was a priority, but Ruede still had not established an alternate source; and that "[b]asic tasks" were requiring "constant reminders." (PageID.690.) ("Fly ash" is ash produced from the burning of pulverized coal. User Guidelines for Waste and Byproduct Materials in Pavement Construction, Federal Highway Administration Research and Technology, https://perma.cc/Y3QW-RJ8N.) The performance improvement plan included a bulleted list of six items that Ruede was supposed to accomplish in the 90 days. (PageID.691.) Among these items were that Ruede was to qualify a company as an alternate source for fly ash, complete lab tests on the fly ash, and complete a study evaluating "foam reaction time." (PageID.691.) The PIP further stated, "We will meet each Tuesday at 3:00 p.m. . . . The focus of these meetings will be to discuss your progress on the areas identified above." (*Id.*) Tudor also wrote, "Assuming you successfully

complete this plan for improvement, you will be expected to maintain the improved level of performance throughout your employment with CertainTeed." (PageID.692.)

Ruede completed the 90-day performance improvement plan. The last weekly meeting under the PIP was on January 23, 2018. When later asked about what was said at the January 23 meeting, Tudor recalled, "I said [to Ruede], 'Okay, the PIP is done. You completed everything.' You know, 'Keep going.'" (PageID.618.) It is unclear whether Tudor told Ruede at the January 23 meeting that he believed that Ruede had struggled to complete the PIP. (PageID.628.)

That would not be communicated to Ruede until March 2018. Around that time, Tudor was preparing Ruede's performance evaluation for the 2017 calendar year. Tudor told Nicole Orlosky, a human resources manager for CertainTeed, that Ruede was continuing to have the same issues that he had prior to the PIP. (PageID.737, 739.) Orlosky recommended that Tudor document what was said at the January 23 meeting. (PageID.738.) Tudor did so. In a memo to Ruede dated March 6, 2018, Tudor wrote, "The 90 day PIP period concluded on January 24, 2018. You have completed all of the items outlined within the PIP." (PageID.694.) Tudor's memo continued, "You have completed all of the items listed within the PIP, however this is

9

with a very high degree of interaction and guidance (weekly 1:1 meetings). You need to continue to build upon your achievement and perform at a high level, even with less guidance." (PageID.694.) "In addition," Tudor wrote, "I recommend that you take a high level viewpoint within your projects (less task oriented), and be decisive and speak-up about things that are important within your projects." (PageID.694.)

When Ruede was later asked about this memo, he disputed that there was a "very high degree of interaction and guidance" during the PIP. He explained that in the normal course, he would have a one-hour meeting with Tudor every month. (PageID.342–343.) On the PIP, Ruede had weekly meetings that were 15 minutes long. (*Id.*) "So," according to Ruede "if you total up four 15-minute meetings, that's equal to one—the standard of one monthly one-on-one meeting. So there[] [was] not . . . very high degree of interaction and guidance." (PageID.342.)

The same day that he authored the memo, March 6, 2018, Tudor also completed Ruede's performance evaluation for 2017. It was not positive. Tudor wrote, "Paul struggled with many projects this year." (PageID.709.) Tudor noted that Ruede often stated that management was not listening; but, wrote Tudor, Ruede needed to first make sure that the work had been done to enable a decision by management. (*See id.*) Tudor provided

10

examples of "gaps" that occurred in 2017, including the lack of progress in finding a replacement catalyst and replacement fly ash. (*Id.*) Tudor remarked, "Paul must learn from these projects and strive to be better prepared in the future." (*Id.*) Tudor evaluated Ruede's performance at a 1.5 out of four or five. (PageID.706.) (The record is ambiguous as to whether CertainTeed used a four- or five-point scale. (*See* PageID.316, 589.))

At some point after his termination, Ruede drafted a rebuttal to Tudor's examples of "gaps." (ECF No. 21, PageID.1016.) (Although the rebuttal is undated, it includes a reference to being fired. (*Id.* ("Dave Beck[] was let go 2 weeks *before me*[.]").)) In his rebuttal, Ruede indicates that despite advocating for a new catalyst, he "could not get people to see the urgency," and CertainTeed continued to use the old catalyst. (*See id.*) Regarding the fly ash, Ruede indicates that someone from purchasing had insisted that the old source be used; further, Ruede stated that a decision-maker from another group had pushed other trials ahead of Ruede's trials on the alternate fly ash. (*Id.*)

In April 2018, Tudor called Orlosky in HR to discuss Ruede's ongoing performance issues and to inform her that he was recommending Ruede's termination. (PageID.738.) Orlosky asked Tudor to prepare a memorandum backing his recommendation. (*Id.*)

Tudor prepared a document titled "Record of Meetings and Performance of Paul Ruede." (PageID.712.) In a section of the document dedicated to post-PIP conduct, Tudor noted that there had been recent claims about the ICON product "which are likely caused by the expired chemicals being used." (PageID.713.) Tudor further noted that it was Ruede's lack of urgency in finding a replacement catalyst that caused the plant to use the expired catalyst for the ICON product. (*Id.*) In the post-PIP section, Tudor also noted that it had been discovered that the specifications for the ICON raw materials were inaccurate. (PageID.714.) Tudor further described how Ruede had failed to properly prepare a table for a meeting despite having several chances to do so and despite the meeting being rescheduled.  (*Id.*) Tudor documented a couple of other post-PIP issues. (*Id.*)

In April 2018, Ruede was terminated from CertainTeed. Tudor recalls speaking with Barpanda about terminating Ruede: "I told him my thoughts on his performance, and I said, 'It's time because he's not going to improve, I don't see his performance improving.' So, ultimately, Dev [Barpanda] said, 'Yes, let's go forward.'" (PageID.667.) Barpanda confirmed that while both Tudor and Orlosky advised him on Ruede's termination, he was the final decision-maker. (PageID.550.) According to Ruede, when Tudor walked him to HR for exit paperwork, Tudor merely said something like "well, you know,

you had performance issues in 2017." (PageID.399.) Tudor recalls giving Ruede a more extensive explanation for his termination. (PageID.669–670.) In either case, Ruede's last day working for CertainTeed was April 12, 2018. (PageID.419, 590.)

Not long after Ruede was fired, Tudor posted an opening for "Product Development Chemist" at the Development Center. (PageID.645; ECF No. 21, PageID.1046.) Although this was a different title than Ruede's, it appears that CertainTeed either stopped using the job title Ruede held ("Senior Materials Scientist") or stopped having a person in that role. (*See* PageID.608–609; PageID.641.) Tudor hired Mathew Boban, Ph.D., for the Product Development Chemist position. (PageID.645, 667.) Boban was a younger worker; in fact, CertainTeed was Boban's first post-doctoral job. (PageID.492, 608.) Both Tudor and Barpanda testified that Boban did not take over much, if any, of Ruede's duties. (PageID.493, 643.) Ruede believes that Boban filled his position. (ECF No. 21, PageID.769.)

## B.

After seeking relief through the Equal Employment Opportunity Commission, Ruede filed this lawsuit. (*See* ECF No. 1.) His amended complaint includes three counts. In Count I, Ruede alleges that CertainTeed "treated younger employees more favorably than [himself] and other older

employees" and "terminated [him] because of his age" in violation of the federal Age Discrimination and Employment Act. (ECF No. 13, PageID.72.) Count II alleges a violation of the Elliott-Larsen Civil Rights Act, Michigan's counterpart to the federal age-discrimination statute. (*Id.* at PageID.73.) Count III asserts breach-of-contract: Ruede only received four weeks' severance when he should have received 18 weeks' severance. (*Id.* at PageID.74.)

CertainTeed now seeks summary judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 18.)

## II.

Rule 56 provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Or stated less formally, after construing the evidence in the light most favorable to Ruede, if this Court believes that no reasonable jury could find for Ruede on his claims, CertainTeed is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

### III.

The Court begins with Ruede's claim that CertainTeed violated state and federal statutes prohibiting age discrimination in the workplace.

### A.

Before turning to the specifics of this case, the Court puts in place the general framework for analyzing Ruede's age-discrimination claims at the summary-judgment stage.

The federal Age Discrimination and Employment Act of 1967 (ADEA) prohibits an employer from depriving an employee of the "privileges of employment[] because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, Michigan's Elliott-Larsen Civil Rights Act (ELCRA) prohibits an employer from depriving an employee of a "privilege of employment[] because of . . . age[.]" Mich. Comp. Laws § 37.2202(1)(a).

Despite very similar language, one difference in how courts have construed the two laws is worth discussing here. Under the ADEA, a plaintiff must show that but-for his age, his employer would not have taken the adverse action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 178 (2009). And while there has been a call to reassess whether Michigan's analog also demands but-for causation, *Hrapkiewicz v. Wayne State Univ. Bd. of Governors*, 910 N.W.2d 654, 655 (Mich. 2018) (Markman, C.J., dissenting

15

from denial of leave to appeal), for now, a plaintiff can prevail under ELCRA by showing that his age was a "substantial" or a "motivating" factor in the adverse employment action, *Drews v. Berrien Cty., Michigan*, 839 F. App'x 1010, 1012 n.1 (6th Cir. 2021); *Debra v. JPMorgan Chase & Co.*, 749 F. App'x 331, 340 (6th Cir. 2018). That is generally a lower bar than but-for causation. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349 (2013) (describing "motivating factor" as a "lessened causation standard"). In this case, the difference in the causation standard does not matter: as will be explained, Ruede has not marshaled enough evidence for a reasonable jury to find that his age was a "substantial" or "motivating" factor in his termination or that but-for his age, he would have kept his job.

Apart from the causation standard, the summary-judgment framework for analyzing age-discrimination claims under ADEA and ELCRA are the same. *See Debra*, 749 F. App'x 331. A court can first decide whether there is direct evidence of age discrimination. If the Court finds that there is no direct evidence, it uses the familiar *McDonnell Douglas* burden-shifting framework to analyze the plaintiff's discrimination claim. *See id.*

Here, there is no direct evidence of age discrimination. *See Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326 (6th Cir. 2021) ("In reviewing direct

16

evidence, we look for evidence from the lips of the defendant proclaiming his or her animus." (internal quotation marks and ellipses omitted)); *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 79 (6th Cir. 2020) ("[D]irect evidence does not require a factfinder to draw any inferences to conclude that the employer wrongfully discriminated."). True, Ruede has testified that Minas Apelian, a high-level CertainTeed employee, made ageist remarks. For instance, when Apelian was announcing CertainTeed's policy to hire younger people and eventually promote them to managers, Ruede recalls that Apelian made a remark about Ruede's young children: "And [Apelian], in front of the room said . . . how can I do it, how can I handle young children, I'm so old, you know." (PageID.373.) Ruede also recalls, "[Apelian] also told Dave Beck—this didn't affect me, but he told Dave Beck that he was too old for the job." (PageID.373.) Although Apelian's remarks are troubling, the evidence indicates that they were not directed at Ruede's job performance or tied to Barpanda's or Tudor's assessment of Ruede. Ruede testified that Apelian commented on his children a few times, including before Barpanda and Tudor even joined CertainTeed. (PageID.379, 381.) And, as Ruede himself stated, the comments about Beck "didn't affect me." Further, Apelian was Barpanda's supervisor, i.e., he was three levels above Ruede. Indeed, the evidence shows that as far as Ruede's termination, the

17

buck stopped with Barpanda. (PageID.550.) So, in short, there is not direct evidence of age discrimination. *See Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004) ("Statements by non-decision makers, or statements by decision makers unrelated to the decisional process itself can not suffice to satisfy the plaintiff's burden of demonstrating animus." (alternations omitted)).

That means this Court employs the familiar *McDonnell Douglas* burden-shifting framework to decide whether CertainTeed is entitled to summary judgment on Ruede's age-discrimination claims. Under that framework, Ruede has the initial burden of production: he must produce evidence establishing a prima facie case of age discrimination. *See Pelcha*, 988 F.3d at 325. If Ruede succeeds, a presumption of discrimination arises. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). CertainTeed must then produce evidence from which a reasonable jury could find that it discharged Ruede for reasons unrelated to his age. *Pelcha*, 988 F.3d at 325. If CertainTeed succeeds at step two, the *McDonnell Douglas* framework has done most of its work, and the summary-judgment question reduces to whether Ruede was terminated because of his age. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142–43 (2000) (explaining, where employer met its burden of production at step two, "the *McDonnell Douglas*

18

framework—with its presumptions and burdens—disappeared, and the sole remaining issue was discrimination [or not]" (internal quotation marks omitted)).

Even so, there is a third step: an employee "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143. After all, if the employer's stated reason is shown to be false, it is often the case that the true reason is discrimination. *See id.* at 147. But often is not always: "proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not *necessarily* establish that the plaintiff's proffered reason . . . is correct." *Id.* at 146–47 (emphasis added). Thus, the Court must never lose sight of the "ultimate question": "whether the employer intentionally discriminated." *Reeves*, 530 U.S. at 146; *see also Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) ("The plaintiff's burden to demonstrate pretext in the final step then 'merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981))).

The Court turns to applying this three-step framework to the facts of this case.

1.

The parties dispute whether Ruede can establish a prima facie case of age discrimination. To be more specific, the parties dispute whether Ruede has evidence of the fourth element of the prima facie case: that "[h]e was replaced by someone outside of the protected class or similarly situated non-protected employees were treated more favorably." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326 (6th Cir. 2021). In CertainTeed's view, Ruede's position "was not re-posted or filled" and "[n]o Senior Materials Engineer was hired after Plaintiff's termination on April 12, 2018." (ECF No. 18, PageID.123.) But from Ruede's perspective, he was replaced by Boban, a person younger than 40. (ECF No. 21, PagID.781.)

The Court need not resolve this dispute. Even if Ruede can establish a prima facie case of age discrimination, CertainTeed is still entitled to summary judgment for reasons set out below. So the Court can assume without deciding that Ruede has established a prima facie case. *See Drews v. Berrien Cty., Michigan*, 839 F. App'x 1010, 1012 (6th Cir. 2021) (taking same approach).

20

2.

At step two of the *McDonnell Douglas* framework, the employer must produce evidence of a non-discriminatory reason for terminating the plaintiff's employment. Here, CertainTeed says it terminated Ruede's employment because of "his poor work performance." (ECF No. 18, PageID.123–125.)

There is ample evidence supporting that assertion. Barpanda thought that Ruede did not perform well during 2016 and issued a performance evaluation to that effect. Then, a different supervisor, Tudor, thought Ruede did not perform well during 2017 and issued a performance evaluation to that effect. And Barpanda's evaluation was not just his opinion—it included feedback from Ruede's direct supervisor before Tudor and from Ruede's coworkers. (PageID.473–474, 579.) And while Ruede asserts that Barpanda "cherry-picked" his coworkers remarks, it remains that Ruede's coworkers said he "commonly starts but does not finish well on projects" and "often does not prioritize his work well enough to bring his project steps to a conclusion." (PageID.579.) As for the performance review authored by Tudor, Tudor included specific examples of performance "gaps." (PageID.709.) Indeed, no one disputes that some of the ICON product was produced using an old catalyst (PageID.690; ECF No. 21, PageID.1016), no

21

one disputes that consumers complained about gapping in the ICON product (PageID.480, 713), and no one disputes that Ruede spent many of his working hours working on the ICON project (PageID.392).

Accordingly, the Court finds that CertainTeed has carried its burden of production at step two of the *McDonnell Douglas* framework, i.e., CertainTeed has produced adequate evidence that it terminated Ruede's employment for poor performance.

3.

So, as is often the case, things boil down to the third step: whether Ruede can show that CertainTeed's claim of poor performance is a pretext for age discrimination and, more fundamentally, whether a reasonable jury could find that Ruede's age was at least a "motivating factor" in his termination.

Most of the time, a plaintiff attempts to establish pretext in "one of three ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (internal quotation marks omitted). "But these are not the only ways that a plaintiff can establish pretext; these three categories are simply a

convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Id.* So Ruede "remain[s] free to pursue arguments outside these three categories." *Id.*

Here, Ruede attempts to show that CertainTeed's performance justification is just a pretext for age discrimination by demonstrating (1) that he in fact performed well, (2) that the circumstances surrounding his termination are curious, and (3) that during Barpanda and Tudor's tenure at CertainTeed, older workers were forced to leave the company and younger workers were hired.

None of these three attempts succeed at establishing pretext for discrimination.

Start with Ruede's performance. As the Court explained at step two of the *McDonnell Douglas* framework, there is considerable evidence that Ruede did not perform well in 2016 and through the end of his employment. And this evidence comes from different people: Barpanda, Tudor, and coworkers. And some of this evidence is undisputed: ICON siding was not a success, there were issues with gapping, Ruede was the sole chemist at the Development Center on the ICON project, and Ruede spent much of his time in 2016 and 2017 working on the ICON project.

The Court acknowledges that Ruede believes he performed well and that he has offered some evidence in support of that belief. (*See* ECF No. 21, PageID.764, 771, 779–780.) In 2016 or early 2017, Ruede received a Special Top Achievement Recognition or "STAR" for altering a chemical process and saving CertainTeed $4.6 million. (PageID.570.) And Ruede points out that he is the named inventor on a patent application that CertainTeed filed not long before his termination and continued to pursue after. (ECF No. 21, PageID.769.) Further, Ruede has offered a written rebuttal to the performance "gaps" that Tudor identified. (ECF No. 21, PageID.1016.) And when he was deposed in this case, Ruede explained why some of the performance issues were not his fault. For instance, Ruede testified that some of the reports he wrote were delayed due to Tudor (*see* PageID.346–347) and that others caused or contributed to the delay in changing the catalyst for the ICON product (*see* PageID.357–358).

But even crediting Ruede's explanations for Barpanda's and Tudor's performance critiques, Ruede has at most created a genuine dispute over his performance. Yet that alone is not enough to survive summary judgment. If an employer decides to terminate an employee based on the sincere belief that the employee's performance is poor, then the employer's decision is motivated by that belief and not the employee's age—even if the

24

employer's performance assessment is, objectively speaking, wrong. *See Treadway v. California Prod. Corp.*, 659 F. App'x 201, 210 (6th Cir. 2016) ("The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions but only from decisions that are unlawfully motivated."); *Land v. S. States Coop., Inc.*, 740 F. App'x 845, 849 (6th Cir. 2018) ("[T]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons.").

Here, the evidence of Ruede's performance would not permit a jury to reasonably question whether Barpanda and Tudor honestly believed that Ruede's performance was deficient. As to the STAR award, Barpanda believed (right or wrong) that Ruede obtained the award for work done before the period under evaluation. (*See* PageID.487–488.) And although Ruede prepared a written rebuttal to Tudor's performance critiques, it appears that Tudor never saw that rebuttal before recommending that Ruede be fired. (*See* ECF No. 21-6, PageID.1016 (written rebuttal references being "let go").) And Ruede admits he did not submit a rebuttal to Barpanda's performance review. (PageID.325.) So even if Ruede's performance was in fact adequate, every reasonable jury would infer that

25

Barpanda and Tudor did not think that was the case. And because Barpanda and Tudor sincerely believed Ruede's performance was poor, it is that belief, rather than Ruede's age, that motivated their decision to terminate his employment.

Ruede also attempts to cast doubt on the legitimacy of Barpanda's and Tudor's performance assessments by claiming that he did not have negative performance reviews until Barpanda and Tudor—both 20 years younger than him—became his supervisors. (*See* ECF No. 21, PageID.779, 786.)

A reasonable jury could not find that this is probative of age discrimination. First, Ruede has not cited any evidence backing his claim that he "consistently received positive performance evaluations" before Barpanda and Tudor arrived at CertainTeed. (*See* ECF No. 21, PageID.779.) Indeed, Ruede's performance reviews for 2015 and earlier are not part of the summary-judgment record. Second, the record provides—or at least hints—at why things changed with Barpanda and Tudor. The two were longtime managers at Dow Chemical, and thus, their supervisory methods and expectations were likely different from Ruede's prior supervisors. In fact, Ruede testified that his direct supervisor before Tudor, Jeff Hatch, was "lazy" and that Hatch's lack of work ethic could be why Hatch did not make a single comment on Ruede's performance review for 2015. (PageID.310.)

26

Ruede also argues that the strange circumstances surrounding his termination suggest that he was terminated because of his age. He points out that he completed the PIP yet, less than 11 weeks later, he was terminated. (ECF No. 21, PageID.783, 785.) He also points out that on the PIP, he was required to meet with Tudor every week, yet Tudor later faulted him for needing a "very high degree of interaction and guidance (weekly 1:1 meetings)." (*See id.*)

On the surface, the timing does seem odd: if Ruede performed well enough to complete the PIP, how could his performance warrant termination just 11 weeks later? And on the surface, Tudor's critique seems contradictory: how could he require that Ruede attend weekly meetings while on the PIP but then fault Ruede for needing "weekly 1:1 meetings"?

But upon deeper dive into the evidence, these questions have non-discriminatory answers. As to the weekly PIP meetings, it was not just the quantity that Tudor was concerned about. Tudor later explained, "I think the way I phrased it there was the high degree of interaction and guidance [on the PIP]. So that meant, at our one-on-one meetings, I had to direct him on what to do, what to work on next, and then, 'Did you get this done?' those types of things." (PageID.622.) In other words, it was not just the number of meetings that concerned Tudor but the micromanagement. As for the fact

that Ruede was terminated weeks after completing the PIP, the record explains the timing. In Tudor's view, Ruede did not complete the PIP with flying colors: "[Ruede] completed everything that was outlined [in the PIP], but it was a struggle." (PageID.628.) And Tudor believed that there were continuing performance issues after the PIP. (PageID.712–714.) So looking at the situation from Tudor's perspective, there was nothing odd about Ruede completing the PIP and then being terminated 11 weeks later. And while Ruede's perspective is different than Tudor's, the question is what motivated Tudor to recommend Ruede's termination. Every reasonable jury would find that it was Ruede's performance, not his age.

Ruede next claims that CertainTeed had a habit of pushing out older workers and hiring younger workers. He asserts that around the time of his termination, four older CertainTeed employees were fired or otherwise released (PageID.395) and that a 70-year-old was "allowed" to retire (*id.*). Ruede also asserts that Tudor "filled [his] position by hiring a younger individual, Mathew Boban" and that "Tudor had a habit in 2018 of hiring younger people. Four in fact: Mitra Britton, David Hagelgans, Mathew Boban, and Chris Colyn." (ECF No. 21, PageID.768–769.) Tudor also hired Japtiwale, a younger worker. (PageID.664.) And Ruede believes that

Japtiwale was hired pursuant to a company policy of hiring younger workers and promoting them to become managers. (PageID.368–369.)

Even assuming three or four examples in a very large company sound promising for Ruede's age-discrimination claims, a deeper dive into the record again reveals that it does not amount to much. For three out of the four older workers that Ruede says were forced to leave CertainTeed, Ruede offers no evidence as to the circumstances surrounding their exit. (*See* PageID.395.) So for all the record shows, the three workers were poor performers or CertainTeed switched to projects that did not require their skills. As to the fourth older worker, Ruede himself suggests that poor performance, not age, was the reason he was fired: "Dave Beck[] was let go 2 weeks before me for his lack of satisfactory ICON production." (ECF No. 21, PageID.1016; *see also* PageID.396.) As for the 70-year-old who was "allowed" to retire, that was Walrath; and Ruede admits that Walrath had long talked about retiring at age 70. (PageID.362, 396, 493.) So Ruede's reliance on the exit of older workers from CertainTeed does little to help his case.

That leaves the younger employees that Tudor allegedly hired. For two of these employees—Mitra Britton and Chris Colyn—the testimony that Ruede cites does not show that Tudor hired them; Tudor merely testified

29

that they were "pulled into [a] project" as it got closer to launch. (*Compare* ECF No. 21, PageID.770 (citations to Tudor's deposition), *with* ECF No. 18, PageID.605.) True, Tudor did hire Japtiwale, Hagelgans, and Boban, each of whom were likely "younger" workers and certainly younger than Ruede. (*See* PageID.392, 608, 642, 664.) But Ruede cites to nothing in the record suggesting that Tudor hired Japtiwale, Hagelgans, or Boban to perform Ruede's duties or otherwise push Ruede out of the company. Perhaps the hiring of Boban gets closest to permitting that inference, but there was considerable testimony from both Tudor and Barpanda that Boban did not take over Ruede's duties and that Boban was more of a replacement for Walrath. (PageID.491–494 (explaining that Boban assumed some of Walrath's duties), PageID.611 (explaining that Tudor, Colyn, and Britton took over ICON work after Ruede left), PageID.643 (stating that Boban did not take over Ruede's duties).)

As for the policy of hiring younger workers and promoting them to managers, it is more innocent than it sounds: "[Apelian said that] we've established programs . . . so that young people come in and . . . have a career at Saint-Gobain and not just come there and go." (PageID.378.) And even if that employee-retention effort discriminates based on age, the connection between that hiring policy and Ruede's firing is tenuous at best. For

instance, nothing suggests that the hiring of Japtiwale, which Ruede suggests was pursuant to the policy (PageID.368–369), hastened or caused Ruede's exit. (*See* PageID.666 (indicating that Japtiwale's tasks were "95%" different than Ruede's).)

In short, Ruede has at best shown that CertainTeed's articulated reason for terminating his employment—poor performance—was mistaken or wrong. But Ruede has not taken the further step of showing that the claim of poor performance was a coverup for age discrimination. Yet it is this latter showing that is required to survive summary judgment. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 146–47 (2000) ("It is not enough to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." (alterations and internal quotation marks omitted)).

### 4.

While that mostly resolves Ruede's state and federal age-discrimination claims, the Court is cognizant that "[t]he ultimate question is whether the employer intentionally discriminated." *Reeves*, 530 U.S. at 146; *see also Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) ("The plaintiff's burden to demonstrate pretext in the final step then 'merges with the ultimate burden of persuading the court that she has been

the victim of intentional discrimination.'" (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981))). To this end, the Court briefly addresses some of Ruede's testimony that Barpanda, and possibly Tudor, viewed his age negatively.

Many of the incidents that Ruede attempts to associate with age bias are typical workplace interactions and none reveal any age animus. For instance, Ruede recalls a situation where Barpanda was in the breakroom talking to others, and when Ruede walked in "[Barpanda] said, I don't—with anger in his voice, I don't want any of the small-talk around here. If you have something to say about me, you say it to me directly, don't talk to other people." (PageID.320, 323.) Ruede also recalls that he and another coworker agreed on an 11:30 a.m. deadline, but the day before the deadline, Barpanda moved the deadline to 8:30 a.m. (PageID.227–228.) As for Tudor, Ruede remembers an incident where he had assigned an intern a multi-week project but, unknown to Ruede, the intern stopped working on it midway through; when Ruede inquired why that happened, "[Tudor] said, Well, [the interns] have higher priority to work on, higher priority to work on. I said, But I have timings. I promised these things by certain dates. What about that? And [Tudor] just sort of looked at me and said, What do you want me to do? Sort of looked at me, didn't say—without words didn't

32

say anything." (PageID.371.) Ruede also recalls complaining to Tudor about an information video CertainTeed posted online and Tudor responding that "he was not going to be involved with taking it down because we didn't put it there." (PageID.382.) Ruede speculates that "if I had been a younger person [Tudor] would have just accommodated" his complaint about the video. (PageID.381.) In this Court's opinion, incidents like these are common in the workplace. At most these incidents show that Barpanda and Tudor were tough on Ruede; but they offer no insight as to why that was so, let alone that age was the reason.

Ruede does recall a few other incidents that, construing the evidence most favorably for Ruede, could be seen as more age-related. For instance, he points out that Barpanda or Tudor assigned Japtiwale, a younger worker, two interns while he and Walrath, both older, were not assigned the two interns. (PageID.366–367.) Ruede also asserts that Barpanda, and possibly Tudor, would require him and Walrath to complete projects in less time than younger workers. (PageID.391.) Ruede also remembers Barpanda making him do some calculations by hand while Japtiwale and the two interns (i.e., younger workers) were allowed to "just press buttons" on a machine to get the results. (PageID.213–214, 230–231.)

These incidents do not establish that Barpanda or Tudor were biased against older workers—at least not to the point where it motivated their decision to terminate Ruede's employment. Ruede indicated that the reason Japtiwale was assigned interns was because he wanted to be a manager (or was hired to become one). (PageID.366.) In contrast, Ruede's position, which he held long before Barpanda or Tudor arrived at CertainTeed, was not a management position. (PageID.288 ("I had no supervisor responsibilities in the job 2010 and beyond.").) As for Barpanda or Tudor requiring Ruede and Walrath to complete projects in less time than younger workers, Ruede admitted that the younger workers' duties were different than his. (PageID.393.) Finally, as to the calculations, it is entirely unclear why Barpanda forced Ruede to do them long hand while the interns were allowed to use machines. But even if this was because of age, Ruede does not argue that being forced to calculate by hand was itself an adverse employment action, and it is too much of a stretch to infer from that minimal disparate treatment that Barpanda was motivated to fire Ruede because of his age.

* * *

Having completed the *McDonnell Douglas* analysis, and having considered the ultimate question of age discrimination, the Court finds that no reasonable jury could find that Ruede's age was a "motivating" or

"substantial" factor in Tudor and Barpanda's decision to terminate Ruede's employment. So CertainTeed is entitled to summary judgment on Ruede's claim under Michigan's Elliott-Larsen Civil Rights Act. And because the federal Age Discrimination in Employment Act requires a stronger or, at least, a similar causal link, *see Drews v. Berrien Cty., Michigan*, 839 F. App'x 1010, 1012 n.1 (6th Cir. 2021), CertainTeed is also entitled to summary judgment on Ruede's claims under ADEA.

## IV.

That leaves Ruede's breach-of-contract claim under state law. Ruede claims that CertainTeed paid him four weeks' severance, but, contractually, owed him 18 weeks' severance. (PageID.415; ECF No. 13, PageID.75; ECF No. 21, PageID.758.)

No reasonable jury could agree with Ruede. Even assuming that CertainTeed's severance policy is an enforceable contract, the stated "purpose" of the policy is to provide benefits to CertainTeed employees terminated "due to a reduction in force/downsizing, change in company direction, or job elimination." (PageID.716.) And to make its scope clear, the policy states, "Employees are not entitled to severance pay if the termination is for any of the following conditions: . . . Discharge for Cause. 'Cause' shall be defined as termination for misconduct or performance

reasons as determined by the Company in its sole discretion." (PageID.717.) As discussed, the record reflects that Barpanda and Tudor terminated Ruede because of poor performance. (*See also* ECF No. 21-23, PageID.1055 (EEOC charge stating "I was discharged allegedly for performance issues").) And while Ruede has evidence that his performance was better than Barpanda and Tudor believed, the severance policy expressly states that performance is "determined by the Company in its sole discretion." In other words, it was Barpanda's and Tudor's opinions that mattered, not Ruede's. Finally, the severance policy requires an employee to "sign an agreement and release claims to receive severance pay." (PageID.717.) Ruede admits, "I signed no release." (PageID.415.)

In short, on at least two fronts, Ruede's breach-of-contract claim fails as a matter of law.

V.

For the reasons given, no reasonable jury could find for Ruede on any of his claims, so CertainTeed's motion for summary judgment (ECF No. 18) is GRANTED.

SO ORDERED.

Dated: September 10, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE